UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL F. RAMSEY,

                                    Plaintiff,

          v.

GLENN S. GOORD, DONALD SELSKY,
MR. RYERSON, THOMAS G. EAGEN,
JOHN H. NUTTALL, MICHAEL McGINNIS,
PAUL CHAPPIUS, JR., A. BARTLETT,
M. SHEAHAN, J. IRIZARRY, J. HALE,
J. CIESLAK, SGT. LITWILDER, J. AMES,
C.O. CLARK, C.O. HELD, and P. KLATT,

                                    Defendants.
_____

**REPORT**
**and**
**RECOMMENDATION**

05-CV-0047A(F)

APPEARANCES:          MICHAEL F. RAMSEY, *Pro Se*
                      91-B-2334
                      Shawangunk Correctional Facility
                      Box 700
                      Walkill, New York 12589

                      ANDREW M. CUOMO
                      Attorney General, State of New York
                      Attorney for Defendants
                      KIM S. MURPHY
                      Assistant Attorney General, of Counsel
                      Main Place Tower
                      Suite 300A
                      350 Main Street
                      Buffalo, New York 14202

## JURISDICTION

          This action was referred to the undersigned by Honorable Richard J. Arcara, on

November 18, 2005, for all pretrial matters including report and recommendation on

dispositive motions  The matter is presently before the court on Defendants' motion for

summary judgment (Doc. No. 22), filed January 22, 2007.

# BACKGROUND

Plaintiff, proceeding *pro se*, commenced this civil rights action on January 25, 2005, while incarcerated at Southport Correctional Facility ("Southport"), in Pine City, New York, against 17 Defendants, all employees of New York State Department of Correctional Services ("DOCS"), including DOCS Commissioner Glenn S. Goord ("Goord"), DOCS Director of Special Housing Unit ("SHU") and Inmate Disciplinary Program Donald Selsky ("Selsky"), DOCS civilian hearing officer David Ryerson ("Ryerson"), DOCS Inmate Grievance Program ("IGP") Coordinator Thomas G. Eagen ("Eagen"), DOCS Deputy Commissioner John H. Nuttall ("Nuttall"), Southport Superintendent Michael McGinnis ("McGinnis"), Acting Southport Superintendent Paul Chappius ("Chappius"), Southport Assistant Deputy Superintendent of Program Services A. Bartlett ("Bartlett"), Southport Corrections Officers Captain M. Sheahan ("Sheahan"), Southport Food Service Administrator J. Irizarry ("Irizarry"), former Southport IGP Supervisor J. Hale ("Hale"), Southport IGP Supervisor J. Cieslak ("Cieslak"), Corrections Officer ("C.O.") Sergeant Litwiler ("Litwiler"), C.O. J. Ames ("Ames"), C.O. Clark ("Clark"), C.O. Held ("Held"), and Southport counselor P. Klatt ("Klatt") (together, "Defendants"). Plaintiff specifically asserted five claims alleging violations of his constitutional and statutory rights. By order filed August 15, 2005 (Doc. No. 4), District Judge William M. Skretny, *sua sponte*, dismissed several of Plaintiff's claims against some Defendants, such that the remaining claims include (1) denial of due process by Defendant Ryerson in connection with a July 15, 2002 disciplinary hearing ("the disciplinary hearing"), and subsequent appeal of the disciplinary hearing's July 24, 2002 determination ("disciplinary hearing determination") ("First Claim for

Relief"); (2) violations of constitutional rights to free exercise, petition for redress of grievances, due process and equal protection by Defendants Klatt, Clark, Held, Irizarry, McGinnis, and Sheahan relative to a temporary removal of Plaintiff from Southport's kosher meal program ("Fourth Claim for Relief"), and (3) interference with Plaintiff's right to petition for redress of grievances by Defendants Ames and Litwiler in connection with the alleged confiscation of Plaintiff's legal and stationary materials ("Fifth Claim for Relief").  Accordingly, the action was terminated as against Defendants Goord, Selsky, Eagen, Chappius, Bartlett, Hale, and Cieslak.  *Id.*

On January 22, 2007, Defendants filed the instant motion for summary judgment (Doc. No. 22) ("Defendants' motion"), supported by Defendants' Memorandum of Law in Support of Motion for Summary Judgment (Doc. No. 23) ("Defendants' Memorandum"), Statement of Undisputed Facts (Doc. No. 24) ("Defendants' Statement of Facts"), and the Declarations of Defendant Held (Doc. No. 25) ("Held Declaration"), Defendant Irizarry (Doc. No. 26) ("Irizarry Declaration"), Defendant Litwiler (Doc. No. 27) ("Litwiler Declaration"), Rabbi Howard Matasar (Doc. No. 28) ("Rabbi Matasar Declaration"), Defendant Ryerson (Doc. No. 29) ("Ryerson Declaration"), and Defendant Sheahan (Doc. No. 30) ("Sheahan Declaration").  In opposition to summary judgment Plaintiff filed on March 26, 2007, Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 37) ("Plaintiff's Memorandum"), the Affidavit of Michael F. Ramsey (Doc. No. 38) ("Plaintiff's Affidavit"), and a Statement of Disputed Material Facts (Doc. No. 39) ("Plaintiff's Statement of Facts").  In further support of summary judgment, Defendants filed on June 4, 2007, Defendants' Reply Declaration of Assistant Attorney General Kim S. Murphy ("Murphy") (Doc. No. 42) ("Murphy Reply

Declaration"). Oral argument was deemed unnecessary.

Based on the following, Defendants' motion should be GRANTED.


# FACTS[1]

The court separately states the facts relevant to the temporal and geographic nature of Plaintiff's two distinct claims, occurring at different correctional facilities and more than two years apart. At all times relevant to Plaintiff's claims, Plaintiff has been an inmate in the custody of DOCS.


**Disciplinary Hearing**

On July 11, 2002, Plaintiff, then incarcerated at Elmira Correctional Facility ("Elmira" or "the correctional facility"), in Elmira, New York, was issued an Inmate Misbehavior Report ("Misbehavior Report"), by Elmira C.O. Ley, charging Plaintiff with violating DOCS Rules 102.10 (spoken threat), 104.11 (threat of violence), and 107.11 (insolent, abusive, obscene language). Misbehavior Report at Bates No. 1. According to Ley's description of the predicate incident, on July 11, 2002, as Ley walked past Plaintiff's cell, Plaintiff, without any provocation, directed an obscene remark at Ley and verbally threatened to harm or kill Ley's wife, children, and other relatives. *Id*. Defendant O'Herron approved the Misbehavior Report, signing the report as the "Area Supervisor Endorser." *Id*.

---

[1] Taken from the pleadings and motion papers filed in this action. References to documents by "Bates No. __" are to those documents comprising the complete record of the July 15, 2002 disciplinary hearing at issue in this action, filed as an attachment to Defendants' Response to Plaintiff's Request for Production of Documents (Doc. No. 19).

Defendant civilian hearing officer Ryerson conducted a Disciplinary Hearing ("the disciplinary hearing"), regarding the charges, commencing on July 14, 2002,[2] and concluding on July 24, 2002.  Prior to the hearing, Plaintiff was permitted to select a DOCS employee assistant, and Sergeant M. Killacky ("Killacky"), one of the five assistants available and selected by Plaintiff, was permitted as Plaintiff's assistant. When Killacky advised Plaintiff that a document Plaintiff had requested, *i.e.*, an investigative report prepared by one Sergeant O'Herron, did not exist, and questioned Plaintiff's request for an inmate witness whose cell, at the time of the incident, was located one floor above and 19 cells down the galley from Plaintiff's cell, Plaintiff became agitated and refused further assistance from Killacky.  During the disciplinary hearing, Plaintiff requested the assistance of a Spanish speaking assistant, but Ryerson explained that such assistants were reserved for inmates who speak only Spanish and Plaintiff was not solely Spanish speaking.  Disciplinary Hearing T. at Bates No. 14-15. Ryerson did, however, in response to Plaintiff's requests, provide Plaintiff with requested documents, requiring Ryerson to adjourn the hearing to permit Plaintiff time to review the documents. *Id*. at Bates No. 3 and 26.

Plaintiff requested as witnesses at the disciplinary hearing O'Herron, Ley, and two inmates housed on either side of Plaintiff's cell on July 11, 2002, including "Hamilton" and "Marcus."  After three adjournments to permit Ryerson to secure the requested witnesses, Ryerson secured only O'Herron and Ley, and Marcus to testify,

---

[2] Although Plaintiff alleges the disciplinary hearing commenced on July 15, 2002, Complaint, First Claim for Relief ¶ 1, the disciplinary hearing transcript indicates the hearing began on July 14, 2002.  *See* Disciplinary Hearing Transcript at Bates No. 13-14.  Whether the disciplinary hearing began on July 14 or 15, 2002, however, is immaterial to the legal analysis of the issues.

but not Hamilton who was on an extended court trip outside the prison. Disciplinary Hearing T. at Bates No. 24. Ryerson was unable to identify any other inmate housed on either side of Plaintiff at the time of the July 11, 2002. *Id*. at Bates No. 24.

Nevertheless, Marcus testified that he was transferred to the cell next to Plaintiff after the incident in question. Disciplinary Hearing T. at Bates No. 23-24. O'Herron testified in response to Plaintiff's questions regarding O'Herron's investigation of the incident prior to signing the Misbehavior Report, including questions as to whom O'Herron spoke with prior to endorsing the Misbehavior Report. *Id*. at Bates No. 29–30. Ley testified in response to Plaintiff's questions regarding an unrelated incident in which Ley allegedly threw coffee in Plaintiff's face. *Id*. at Bates No. 32-34. Ley denied throwing any coffee, and also testified that he was not a coffee drinker. *Id*. at Bates No. 34. Ryerson advised Plaintiff that whether Ley threw coffee at Plaintiff was irrelevant to the charges pending against Plaintiff in the Misbehavior Report. *Id*. at Bates No. 39-40. Plaintiff exited the hearing room, refusing to stay to hear Ryerson deliver his ruling on the disciplinary charges. *Id*. at Bates No. 39.

On July 24, 2002, Ryerson found Plaintiff guilty as charged in the Misbehavior Report, stating for the record that the finding was based on Ley's testimony, which was credible and confirmed the Misbehavior Report, and that none of the witnesses or documents Plaintiff requested supported Plaintiff's claim. Disciplinary Hearing T. at Bates No. 39; Hearing Record Sheet at Bates No. 41. As penalty, Ryerson imposed 180 days in SHU, and 180 days of loss of recreation, packages, commissary, phone and special events privileges, and recommended loss of six months of good time credit toward Plaintiff's release date. *Id*.

Plaintiff immediately filed an appeal of the disciplinary hearing disposition on July 24, 2002, asserting that he was denied the right to call witnesses, the right to assistance, and was not allowed attend the disciplinary hearing's conclusion. Disciplinary Hearing Appeal, Bates No. 44-45. On August 8, 2002, Plaintiff filed a supplement to his appeal, asserting for the first time that he was denied due process when Ryerson took testimony from Ley over the telephone without electronically recording such testimony, and reasserting Plaintiff's earlier grounds for appeal. Disciplinary Hearing Appeal Supplement at Bates No. 46-48.

On August 21, 2002, Plaintiff's disciplinary hearing disposition was upheld by Defendant Selsky. August 21, 2002 Appeal Decision, at Bates No. 54. On August 23, 2002, Plaintiff appealed the August 21, 2002 Appeal Decision, arguing that he was denied the right to have witnesses testify on his behalf at the disciplinary hearing, and requesting a new hearing. August 21, 2002 Appeal Decision Appeal at Bates No. 55-58. By memorandum dated November 22, 2002, Selsky advised Plaintiff that, at Defendant Goord's direction, Plaintiff's July 24, 2002 disciplinary hearing disposition was administratively reversed based on Hearing Officer Ryerson's inability to clarify a discrepancy regarding the time of the incident. November 22, 2002 Memorandum at Bates No. 62-63. Accordingly, of the 180 days of SHU confinement Ryerson imposed, Plaintiff served only 75 days in SHU.[3]

Plaintiff maintains that throughout the duration of Plaintiff's SHU confinement, Plaintiff was "hand-cuffed, chained, and shackled every time I [Plaintiff] was allowed out

---

[3] Plaintiff maintains he actually served 96 days in SHU. Plaintiff's Affidavit ¶ 75.

of my cell for any reason, including during my one (1) hour a day exercise, family visits, medical examinations, interviews and showers."  Complaint, First Claims for Relief ¶ 6. *See* Plaintiff's Memorandum at 2 (similarly describing SHU confinement conditions).

**Religious Diet**

On August 11, 2002, Plaintiff, then housed at Elmira Correctional Facility, completed a Change of Religious Designation form ("Change of Religion form"),[4] thereby declaring himself to be "Judaic (Jewish)."  Change of Religion Form.  Upon completing the Change of Religion form, Plaintiff, pursuant to DOCS' policy, immediately became eligible to participate in the kosher cold alternative diet program ("CAD Program") and receive kosher meals.

On February 23, 2004, Plaintiff was transferred to Southport, "an all special housing unit [ ] facility where inmates are confined to their cells 23 hours per day,"[5] Litwiler Declaration ¶¶ 4, 6, Plaintiff's Memorandum at 36, where Plaintiff continued to receive the CAD Program diet.  Because the CAD Program diet costs three-times the amount of the regular prison inmate diet, Southport maintains a policy providing for an inmate's involuntary removal from the CAD Program on specified grounds, including (1) finding kosher food items in the cell of another inmate; (2) giving, selling, trading, or exchanging any CAD Program food items while on the CAD Program; and (3) observing

---

[4] Irizarry Declaration Exh. A.

[5] The record does not indicate whether Plaintiff was transferred to Southport from Elmira, or from another correctional facility.

the inmate consuming non-kosher food.  Irizarry Declaration ¶¶ 4-5.[6]  In a Memorandum

dated May 18, 2004 ("May 18, 2004 Memorandum"),[7] directed to all Jewish inmates in

Southport, including Plaintiff, Irizarry advised that the discovery of kosher food items in

the cell of another inmate was cause for removal from the CAD Program.  The inmates

were further advised that if any Jewish inmate who was discovered eating anything

other than non-kosher food would be removed from the CAD Program, and contained

the following statement:

> **This is your only warning**, any violation will result in your swift removal from the
> COLD ALTERNATIVE PROGRAM.

May 18, 2004 Memorandum (bolding and underlining in original).

On July 27, 2004, while housed in Southport, Plaintiff observed Defendant Clark

refuse to provide appropriate food to another Jewish inmate housed in another cell, and

file a false misbehavior report against such inmate.  Plaintiff's Affidavit ¶ 44.  On July

29, 2004, Defendant Klatt, acting as the other Jewish inmate's employee assistant in

connection with the alleged false misbehavior report Clark filed against the other inmate

on July 27, 2004, came to Plaintiff's cell to interview Plaintiff as a witness with regard to

the misbehavior report, and Plaintiff complied by providing Klatt with a written statement

against Clark, to which Plaintiff attached one of Defendant Irizarry's responses to one of

several of Plaintiff's previously filed complaints and grievances regarding missing

kosher food items from Plaintiff's tray.  *Id.* ¶¶ 45-46, 49.

According to a memorandum to Irizarry from Defendant C.O. Held, on July 29,

---

[6] Although Defendants have not attached a copy of the DOCS alternative diet policy, Plaintiff does not dispute Irizarry's description of the policy.

[7] Irizarry Declaration Exh. B.

2004 ("Held's Memorandum"),[8] Held observed an inmate porter take the top half of Plaintiff's kosher food tray and give the kosher food items to another inmate, Anderson, who resided in Southport's C-7 Company with Plaintiff. Held Declaration ¶ 5; Held's Memorandum. When Held asked Plaintiff where the top half of the kosher food tray was, Plaintiff responded he did not have it, and Held then retrieved the tray's top half, including the kosher food items, from Anderson without incident. *Id.* As of July 29, 2004, Plaintiff was the only inmate in Southport's C-7 Company on the CAD program. *Id.* Irizarry then advised Plaintiff, by memorandum dated July 29, 2004 ("Irizarry's Memorandum"),[9] that because Plaintiff permitted the inmate porter to give half of Plaintiff's kosher food tray to inmate Anderson, in violation of the CAD Program, Plaintiff was being removed from the CAD Program, with no date for reinstating Plaintiff to the CAD Program given. Irizarry Declaration ¶ 7; Irizarry's Memorandum.

On July 29, 2004, Plaintiff, upon receiving Irizarry's decision removing Plaintiff from the CAD Program, appealed the decision to Defendant DOCS Captain and Acting Deputy Superintendent of Security Sheahan, alleging that his removal from the CAD Program was in retaliation for grievances Plaintiff had filed against prison staff members, and for the July 27, 2004 statement Plaintiff gave Klatt against Clark concerning another Jewish inmate. Plaintiff's Affidavit ¶¶ 52-53. *See also* Sheahan Declaration ¶¶ 1-2, 6; Irizarry Declaration ¶ 8. After reviewing the investigation materials relative to Irizarry's decision to remove Plaintiff from the CAD Program,

---

[8] Irizarry Declaration Exh. C.

[9] I rizarry Declaration Exh. D.

Sheahan determined Held's Memorandum regarding the incident was credible, particularly given that Plaintiff was the only inmate in his company receiving the CAD Program, and affirmed Irizarry's decision.  Sheahan Declaration ¶¶ 6-7.  By memorandum dated August 10, 2004, ("Sheahan's Memorandum"),[10] Sheahan advised Plaintiff all the evidence establishing Plaintiff's removal from the CAD Program was based on Plaintiff's actions as observed by the prison staff.

It is undisputed that by September 1, 2004, Plaintiff had been reinstated to the CAD Program, although the record does not indicate who made the decision reinstating Plaintiff in the CAD Program, nor the basis for such decision.[11]

## DISCUSSION

**1.    Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be

---

[10] Sheahan Declaration Exh. A.

[11] Plaintiff maintains his reinstatement in the CAD Program occurred on September 4, 2004. Plaintiff's Affidavit ¶ 76.  Although no explanation for the discrepancy in dates is obvious from the record, the discrepancy has no substantive bearing on this Report and Recommendation.

drawn, a moving party cannot obtain a summary judgment. *Celotex*, 477 U.S. at 322. Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).

Vague assertions supported only by self-serving statements in the nonmoving party's affidavit are insufficient to defeat a properly supported summary judgment motion. *Coniglio v. Highwood Services, Inc.*, 495 F.2d 1286, 1292 (2d Cir.), *cert. denied*, 419 U.S. 1022 (1974). "The non-moving party may not rely on conclusory assertions or unsubstantiated speculation [to defeat summary judgment]." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Rather, "the non-movant must produce specific facts indicating that a genuine factual issue exists." *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998) (underlining added). The ultimate inquiry on a summary judgment motion is whether any reasonable jury could find the plaintiff's evidence meets the requisite burden of proof. *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 122-23 (2d Cir. 2004).

Defendants are alleged to have violated Plaintiff's civil rights under 42 U.S.C. § 1983, pursuant to which an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. Section 1983, however, "'is not itself a source of a substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere conferred.'"

*Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989); and *Baker*, 443 U.S. at 140). In the instant case, the Complaint alleges Defendants violated Plaintiff's under the First and Fourteenth Amendments by (1) interfering with Plaintiff's practice of his religion and denying Plaintiff due process in connection with a disciplinary hearing and temporarily removing Plaintiff from the CAD Program, (2) denying Plaintiff his right to petition for redress of grievances by confiscating his legal materials, (3) denying Plaintiff due process in connection with the July 24, 2002 disciplinary hearing and, (4) denying Plaintiff equal protection by temporarily removing Plaintiff from the CAD Program.

Defendants argue in support of summary judgment that (1) Plaintiff's 75-day SHU confinement did not implicate any protected liberty interest, Defendants' Memorandum at 3-8; (2) Plaintiff was not deprived of any due process rights at the disciplinary hearing, *id.* at 8-17; (3) Plaintiff's temporary removal from the CAD Program did not constitute a denial of Plaintiff's right to free exercise of religion, *id.* at 17-11, a violation of Plaintiff's Fourteenth Amendment right to equal protection based on his religion, *id.* 22-23, or a due process violation, *id.* at 26-28; (4) Plaintiff's claims of retaliation for petitioning against grievances are not constitutionally cognizable against Defendants Clark, Held, Irizarry, Klatt, McGinnis, and Sheahan, *id.* at 23-26; (5) Defendants Clark, Klatt, Sheahan, and McGinnis were not personally involved in the decision removing Plaintiff from the CAD Program, *id.* at 28-30; (6) the confiscation of Plaintiff's stationery materials by Defendants Litwiler and Ames did not deny Plaintiff access to the courts,

*id.* at 31-36; and (7) Defendants are entitled to qualified immunity on all Plaintiff's claims, *id.* at 37-38.

In opposition to summary judgment, Plaintiff asserts that the disciplinary hearing sentence imposed by Ryerson, consisting of six months of SHU confinement and loss of good time credit does implicate any protected liberty interest, Plaintiff's Memorandum at 1-4; Plaintiff's due process rights were violated during the disciplinary hearing, *id.* at 4-14; Defendants denied Plaintiff the right to practice his religion without due process, *id.* at 14-20; Defendants retaliated against Plaintiff for filing grievances and complaints about prison conditions, and for giving Klatt a statement against Clark regarding another Jewish inmate, *id.* at 20-22; and Defendants Litwiler and Ames denied Plaintiff access to the courts by confiscating Plaintiffs legal materials and stationery supplies, *id.* at 22-24. In further support of summary judgment, Defendants assert that in opposing summary judgment, Plaintiff fails to point to any genuine issue of material fact sufficient to avoid summary judgment. Murphy Reply Declaration ¶ 4.

## 2.    **Personal Involvement**

Personal involvement of the defendant in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (holding to establish liability under § 1983, plaintiff must show defendant was personally involved in the alleged constitutional violation). The mere fact of supervisory authority, however, is insufficient to demonstrate liability, based on a failure to supervise, under § 1983. *Colon v. Coughlin,* 58 F. 3d 865, 874 (2d Cir. 1995). In the instant case, Defendants argue that four of the Defendants sued in the instant

action were not  personally involved in the alleged constitutional deprivations, including Defendants Southport Superintendent McGinnis, Southport C.O. Captain Sheahan, Southport  C.O. Clark, and Southport counselor Klatt.  Defendants' Memorandum at 28-30.

In particular, Defendants assert that in contrast to Plaintiff's allegation that McGinnis affirmed Irizarry's decision removing Plaintiff from the CAD Program, such decision was reviewed by Sheahan.  Defendants' Memorandum at 29-30.  The grievance Plaintiff filed regarding his removal from the CAD Program was not considered by McGinnis, who was then retired from DOCS, but by then-acting Superintendent Chappius.  *Id*. at 30.  According to Defendants, Sheahan's review of Irizarry's decision is not, by itself, sufficient to demonstrate personal involvement in any constitutional violation regarding the matter.  *Id*.  Defendants further assert that Plaintiff's allegations against Defendants Clark and Klatt are limited to the July 27, 2004 incident involving a different Jewish inmate who was written up by Clark, and that Clark was not even present at Southport on July 29, 2004, when Held observed Plaintiff violating the CAD Program by exchanging kosher food items with another inmate.  *Id*. Plaintiff argues in opposition to summary judgment that Clark and Klatt were personally involved in Plaintiff's removal from the CAD Program because the July 29, 2004 decision removing Plaintiff from the CAD Program was in retaliation for Plaintiff's providing Klatt with a statement against Clark regarding another Jewish inmate. Plaintiff's Memorandum at 15-16.  Plaintiff does not, however, dispute Defendants' argument that neither McGinnis nor Sheahan were personally involved in any § 1983 claim by Plaintiff.

Personal liability of a supervisor may be shown by evidence that (1) the defendant directly participated in the alleged constitutional violation, (2) defendant, after being informed of the constitutional violation by report or appeal, failed to remedy the wrong, (3) defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuation of such custom or policy, (4) defendant was grossly negligent in supervising subordinates who committed wrongful acts, or (5) defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon*, 58 F. 3d at 873.

With regard to Defendant McGinnis, Plaintiff does not dispute Defendants' assertion that Sheahan, rather than McGinnis, reviewed Plaintiff's grievance regarding Plaintiff's temporary removal from the CAD Program. Nor does Plaintiff allege any facts on which to hold McGinnis personally liable for the alleged violations of Plaintiff's civil rights. As such, summary judgment based on lack of personal involvement should be GRANTED with regard to McGinnis.

As for Defendant Sheahan's review of Irizarry's decision removing Plaintiff from the CAD Program, such review constitutes personal involvement based on failing to remedy a wrong "after being informed of the violation through a report or appeal." *Colon*, 58 F.3d at 873. *See Dallio v. Hebert*, 2009 WL 2258964, * (N.D.N.Y. July 28, 2009) (holding inmate plaintiff sufficiently alleged defendants were personally involved in violating constitutional rights by conducting dishonest investigation into incident underlying inmate misbehavior report) (citing cases, including, *inter alia*, *Ramos v. Artuz*, 2001 WL 840131 * 8-10 (S.D.N.Y. July 25, 2001) (finding no personal involvement by superintendent who merely forwarded letters to others requesting

response, but finding personal involvement for prison Health Services Administrator whose sent plaintiff inmate numerous letters containing explanation and justification concerning issues plaintiff raised in letter to defendant superintendent)). As such, Defendants' motion for summary judgment based on lack of personal involvement should be DENIED with regard to Sheahan.

With regard to Defendants Clark and Klatt, Plaintiff, consistent with the Complaint, argues that after Plaintiff provided Klatt, who was assigned as an employee assistant to another Jewish inmate, with a written statement implicating Clark in an unrelated incident involving denial of kosher food items to another Jewish inmate, Klatt, instead of providing the statement to the other Jewish inmate, gave the statement to Held who then retaliated against Plaintiff by removing Plaintiff from the CAD Program. Plaintiff's Memorandum at 15-16; Complaint, Fourth Claim for Relief ¶¶ 1-2. Plaintiff further maintains that Clark, on August 31, 2004, made threats to Plaintiff regarding Plaintiff's grievances and complaints, and conducted a retaliatory raid on Plaintiff's cell, destroying Plaintiff's personal property and legal papers. Complaint, Fourth Claim for Relief ¶ 16. These allegations show sufficient personal involvement by Defendants Klatt and Clark, such that summary judgment based on lack of personal involvement should be DENIED with regard to Defendants Clark and Klatt.

Accordingly, Defendants' motion should be GRANTED with regard to all claims asserted against McGinnis, but DENIED as to all claims asserted against Sheahan, Klatt and Clark.


**3.     Disciplinary Hearing Due Process Claim**

Plaintiff claims that his Fourteenth Amendment procedural due process rights were violated in connection with the July 14, 2002 disciplinary hearing. Complaint, First Claim for Relief ¶ 2. Plaintiff specifically maintains he was denied the opportunity to call witnesses, denied assistant to prepare for the hearing, that Plaintiff was not permitted to hear and respond to evidence against him, and the entire hearing was not electronically recorded. *Id*. Defendants argue that Plaintiff has failed to establish the deprivation of a protected liberty interest necessary to support a denial of due process claim. Defendants' Memorandum at 8-10. Alternatively, Defendants assert that Plaintiff was not improperly denied (1) the right to confront witnesses, *id*. at 10-14; (2) assistance to prepare for his hearing, *id.* at 14-15; (3) the right to hear and respond to any evidence against him, *id*. at 15-16; and (4) Plaintiff had no right to have the disciplinary hearing recorded. *Id*. In opposition to summary judgment, Plaintiff argues that (1) six months of SHU confinement and loss of good time credit does implicate a substantial liberty interest for purposes of a § 1983 claim, Plaintiff's Memorandum at 1-4; Plaintiff was denied his right to an employee assistant in preparation for the disciplinary hearing when his assigned assistant failed to interview witnesses as Plaintiff requested, *id*. at 4-8; although two witnesses Plaintiff properly requested were located, Ryerson failed to grant an extension of the disciplinary hearing to permit the witnesses to be brought in for testimony, *id*. at 8-12; Plaintiff was not permitted to hear any of C.O. Ley's off the record testimony, *id.* at 12-13; and that Ryerson failed to record C.O. Ley's entire testimony, *id*. at 13.

Inmates retain due process rights in prison disciplinary proceedings. *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003) (citing *Wolff v. McDonnell*, 418 U.S. 539

(1984)).  "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation and internal quotation marks omitted).  In the context of a prison disciplinary hearing, to comport with procedural due process, an inmate charged with a prison violation must be given "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action."  *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 444, 454 (1985) (citing *Wolff*, 418 U.S. at 563-67).

### A.     Protected Liberty Interest

Although inmates retain due process rights in prison disciplinary proceedings, *Hanrahan*, 331 F.3d at 97, the Supreme Court has clarified that due process protections are only required when the resulting disciplinary penalty "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  In the instant case, Defendants maintain that the sentence imposed as a result of the disciplinary hearing's guilty disposition, *i.e.*, 75 days in SHU confinement, was not a significant or atypical hardship implicating any protected liberty interest warranting due process protection.  Defendants' Memorandum at 3-8.  Plaintiff argues in opposition not only that he was sentenced to six-months SHU confinement and loss of privileges, of which Plaintiff served 96 as opposed to 75 days, but that he also received six months loss of good time credit toward Plaintiff's release,

thereby extending the duration of Plaintiff's sentence and implicating a protected liberty interest. Plaintiff's Memorandum at 1-4; Plaintiff's Affidavit ¶ 75. In further support of summary judgment, Defendants argue that even assuming, *arguendo*, that Plaintiff served 96 days of the 180 days of SHU confinement sentence with loss of privileges, 96 days is less than the 101 days of SHU confinement the Second Circuit has previously found did not to constitute an atypical and significant hardship. Murphy Reply Declaration ¶ 7 (citing *Sealey v. Gittner*, 197 F.3d 578 (2d Cir. 1999)). Defendants do not respond to Plaintiff's assertion that loss of six months of good time credit implicates a protected liberty interest.

The court observes that Defendants limit their discussion of *Sandin*'s requirements to Plaintiff's confinement in SHU and the contemporaneous loss of packages, telephone and commissary privileges, but do not discuss the loss of six months good time credit. The record establishes that Ryerson, upon finding Plaintiff guilty as charged in the Misbehavior Report, imposed as a sentence 180 days in SHU confinement, with loss of recreation, packages, commissary, telephone and special events privileges, and six months loss of good time. Disciplinary Hearing T. at Bates No. 00039; Hearing Record Sheet at Bates No. 40.

Significantly, Plaintiff has a protected liberty interest in his earned good time credit toward release. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) ("Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship."). *Abed v. Armstrong*, 209 F.3d 63, 66-

67 (2d Cir. 2000) ("inmates have a liberty interest in good time credit they have already earned" (citing *Wolff*, 418 U.S. at 556-58)).  As such, Ryerson was required to provide Plaintiff with due process before imposing on Plaintiff the penalty that included the loss of six months of good time credit.  Although the November 22, 2002 administrative reversal of the disciplinary hearing disposition, November 22, 2002 Memorandum at Bates No. 62-63, likely reinstated the good time to Plaintiff, the record does not specifically establish that the good time was reinstated, and the fact remains that the imposition of such penalty required Plaintiff be provided with due process during the disciplinary hearing.  *Sira*, 380 F.3d at 66, 69 (discussing, in context of prisoner's § 1983 litigation alleging denial of due process in connection with guilty disposition following disciplinary hearing and sentence imposed included loss of six months of good time credit toward release, which was reinstated by reversal of reversal of disciplinary ruling, that plaintiff inmate was entitled to due process prior to imposition of such sentence).

Moreover, Defendants fail to rebut Plaintiff's assertions that throughout the duration of Plaintiff's SHU confinement, Plaintiff was "hand-cuffed, chained, and shackled every time I [Plaintiff] was allowed out of my cell for any reason, including during my one (1) hour a day exercise, family visits, medical examinations, interviews and showers."  Complaint, First Claims for Relief ¶ 6.  *See* Plaintiff's Memorandum at 2 (similarly describing SHU confinement conditions).  Restrictive confinements of less than 101 days generally do not raise a protected liberty interest warranting due process protection, and requiring "proof of conditions more onerous than usual."  *Davis v. Barrett*, __ F.3d __, 2009 WL 2411811, * 3 (2d Cir. Aug. 7, 2009) (citing *Colon v.*

*Howard*, 215 F.3d 227, 231-32 & n. 5 (2d Cir. 2000).  Nevertheless, "SHU confinements of fewer than 101 days 'could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical.'" *Id*. (citing *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir. 2000).  As such, a determination as to whether Plaintiff endured an atypical and significant hardship requires an examination of the conditions of confinement endured by inmates in SHU as compared to inmates in the general prison population.  *Davis*, 2009 WL 2411811 at *4.  Unless the SHU confinement was less than 30 days, such a determination requires a "detailed factual record." *Id*. at *5.  Here, however, the record is not sufficiently developed to allow for the requisite comparison. *Id*.  As such, the court is unable to resolve the issue of  whether Plaintiff has demonstrated a protected liberty interest requiring due process protection based on the 75 or 96 days of SHU confinement.

As such, Defendants cannot be granted summary judgment on this claim on the basis that the imposed penalty did not deprive Plaintiff of any protected liberty interest. In the interest of judicial economy, the court thus assumes, *arguendo*, that Plaintiff has demonstrated a deprivation of a protected liberty interest requiring due process protection in the conduct of the disciplinary hearing conducted by Defendant Ryerson, and considers whether Plaintiff was deprived of any requisite due process during the disciplinary hearing.

### B. Right to Call Witnesses

Plaintiff claims he was denied the opportunity to call inmate Hamilton and "the inmate from I-5-5 cell" as witnesses to testify at the disciplinary hearing. Complaint, First Claim for Relief ¶ 2.A; Plaintiff's Memorandum at 8-12. Defendants argue in support of summary judgment that Plaintiff does not allege in the Complaint which witnesses he was denied calling, and that the disciplinary hearing transcript establishes that the only witness Ryerson did not call was an inmate whose cell was next to Plaintiff's, and that Ryerson denied Plaintiff's request for such witness as the inmate was not present in Southport but, rather, was away from the facility on a court trip. Defendants' Memorandum at 12; Ryerson Declaration ¶¶ 7-8. Defendants also argue that Plaintiff has failed to explain the relevancy of testimony by an inmate witness Plaintiff had mentioned to Killacky, given that such witness was located on a different floor and, presumably, could not have witnessed Plaintiff's encounter with Defendants which led to the misbehavior report against Plaintiff. Defendants' Memorandum at 12; Ryerson Declaration ¶¶ 7-8.

Although Defendants correctly assert that the Complaint fails to allege which witnesses he was denied at the Disciplinary Hearing, *see* Complaint, First Claim for Relief ¶ 2.A (alleging deprivation of due process when Plaintiff was denied "[t]he right to call witnesses" without identifying which witnesses were requested, but not called), the record establishes that prior to the hearing, Plaintiff, in speaking with his assistant Sgt. Killacky, requested as witnesses only Sgt. O'Herron, who investigated Plaintiff's allegations regarding a separate incident in which Plaintiff alleges C.O. Ley threw coffee on Plaintiff, and an inmate housed, at the time of the incident, in cell I-5-5, one floor

above and nineteen cells down from Plaintiff's cell. Defendants' Memorandum at 12; Ryerson Declaration ¶¶ 6, 9. Sgt. Killacky requested Plaintiff explain the relevancy of the remote inmate's testimony, causing Plaintiff to become agitated and to refuse Killacky's further assistance. Ryerson Declaration ¶ 6. Plaintiff did not make any request during the disciplinary hearing for such inmate to testify, nor has Plaintiff ever explained the relevancy of the unidentified inmate's testimony. As such, no due process violation occurred based on Ryerson's failure to call for such inmate to testify at Plaintiff's disciplinary hearing. *See Walker v. McClellan*, 126 F.3d 127, 129 (2d Cir. 1997) (stating that where the inmate plaintiff requesting witnesses' testimony refused to explain the relevance of such testimony, "coupled with the absence of any defense offered for which the testimony of the witnesses might have provided confirmation," no clearly established due process right of the plaintiff was violated by denying the witness).

At the disciplinary hearing, Plaintiff stated he wanted to call as witnesses Sgt. O'Herron, C.O. Ley, three unidentified inmates housed, at the time of the incident, in cells near Plaintiff, and the unidentified inmate on the floor above Plaintiff. Defendants' Memorandum at 12; Ryerson Declaration ¶¶ 9-14; Disciplinary Hearing T. at Bates No. 23-34. Of the six requested witnesses, only Sgt. O'Herron, C.O. Ley, and Marcus, one of the inmates housed near Plaintiff, appeared and testified. O'Herron's testimony was limited to an unrelated incident in which Ley allegedly threw coffee in Plaintiff's face. Disciplinary Hearing T. at Bates No. 29-30. C.O. Ley's testimony confirmed the accuracy of the threats Plaintiff's made to Ley as reported in the misbehavior report. *Id.* at Bates No. 32-34. Ley also denied throwing coffee on Plaintiff, stating the Ley did not

drink coffee. *Id*. at Bates No. 34. As such, the testimony of neither Sgt. O'Herron nor C.O. Ley was helpful to Plaintiff.

Although Plaintiff was unable to identify the two inmates housed in cells on either side of Plaintiff on July 11, 2002, the date of the incident, Ryerson was able to identify one such inmate as "Marcus" and the other as "Hamilton." Disciplinary Hearing T. at Bates No. 23, and 25. Marcus testified that he was transferred to the cell next to Plaintiff after the incident in question and, as such, his testimony was not helpful to Plaintiff. *Id.* at Bates No. 23-24. In any event, Marcus was called, appeared, and testified, and, thus, Plaintiff cannot establish any due process violation based on Ryerson's failure to call Marcus.

Ryerson learned that Hamilton was not at Southport during the disciplinary hearing but, rather, was on "an outside court trip." Ryerson Declaration ¶ 13; Disciplinary Hearing T. at Bates No. 25-27. Ryerson, on July 14, 2002, adjourned the disciplinary hearing in an attempt to obtain Hamilton's testimony, but when the disciplinary hearing recommenced on July 24, 2002, Hamilton had yet to return from his court trip. Disciplinary Hearing T. at Bates No. 39, 43. Plaintiff was unable to explain the relevancy of Hamilton's testimony and Ryerson therefore decided to conclude the hearing without Hamilton's testimony. *Id*. Ryerson's decision to pass on Hamilton's testimony thus did not deprive Plaintiff of any due process. *Walker*, 126 F.3d at 129 (no due process denied where inmate plaintiff refuses to explain relevancy of a denied witness's testimony).

The third unidentified inmate housed near Plaintiff was never identified by Plaintiff and, thus never called. Moreover, Plaintiff never explained the relevancy of any

testimony Plaintiff anticipated such inmate to provide.  Accordingly, the failure to call either the third unidentified inmate housed near Plaintiff, or the inmate housed in a cell remote to Plaintiffs, Discussion, *supra*, at 23-25, did not violate Plaintiff's constitutional due process rights. *Walker*, 126 F.3d at 129.

In short, Defendants' motion for summary judgment should be GRANTED with regard to Plaintiff's claim that he was denied the right to call witnesses at the disciplinary hearing in violation of his due process rights.

### C.     Right to Assistance

Plaintiff claims he was denied the right to an employee assistant in preparing for the disciplinary hearing.  Complaint, First Claim for Relief ¶ 2.B.  Defendants argue in support of summary judgment that Plaintiff was assigned an assistant of his choice, Sgt. Killacky, that Plaintiff refused to cooperate with Killacky, but that Ryerson nevertheless provided Plaintiff with all available documents requested by Plaintiff.  Defendants' Memorandum at 14.  In opposition to summary judgment, Plaintiff maintains that after Killacky was assigned to assist Plaintiff, Plaintiff met with Killacky on July 14, 2002, and provided Killacky with the cell locations of three inmate witnesses Plaintiff wished Killacky to interview, but that Killacky refused to interview the witnesses.  Plaintiff's Memorandum at 5.  Killacky also denied the existence of an investigative report Plaintiff requested.  *Id*. at 5-6.  Plaintiff maintains that Killacky's alleged refusal to comply with Plaintiff's requests was tantamount to a denial of assistance. *Id*. at 6.

The record establishes that Plaintiff was permitted to select five employee assistants from a list of more than 50 such assistants, and that one of the five selected

was assigned as Plaintiff's assistant for the disciplinary hearing.  Tier Assistance

Selection Form, Bates No. 11.  Killacky, who was Plaintiff's second choice, was

assigned to assist Plaintiff. *Id*.  Even if Killacky failed to provide proper assistance to

Plaintiff, however, such failure did not deprive Plaintiff of constitutional due process.

In particular, he Second Circuit has instructed that "the *only* process due an

inmate is that minimal process guaranteed by the Constitution as outlined in *Wolff*."

*Shakur v. Selsky*, 391 F.3d 106, 119 (2d Cir. 2004) (italics in original).  As such,

although relevant New York regulations call for inmates to be provided with assistance

in preparing for disciplinary hearings, 7 N.Y.C.R.R. § 253.4 ("The inmate shall be

provided with an assistant in accordance with the provisions of Subpart 251-4 of this

Subchapter (permitting inmate to select "an employee from an established list of

persons who shall assist the inmate when a misbehavior report has been issued against

the inmate . . .), such regulations "do not create federally protected due process

entitlements to specific state-mandated procedures."  *Holcomb v. Lykens*, 337 F.3d 217,

224 (2d Cir. 2003) (holding that although defendants, Vermont corrections officers, may

have breached Vermont procedural law in revoking an inmate's extended furlough from

prison without following Vermont's state department of correction's written procedures,

such violation did not deprive the inmate of procedural due process under the

Fourteenth Amendment).  *See also Sealed v. Sealed*, 332 F.3d 51, 57 n. 5 (2d Cir.

2003) ("'Elevating a state-mandated procedure to the status of a constitutionally

protected' liberty or property interest, would make process 'an end in itself' rather than a

requirement whose 'constitutional purpose is to protect a substantive interest in which

the individual has a claim of entitlement.'" (quoting *Olim v. Wakinekona*, 461 U.S. 238,

250-51 (1983), and *Doe v. Milwaukee County*, 903 F.2d 499, 503 (7th Cir. 1990))).

Accordingly, in the instant case, even if Plaintiff was denied effective assistance in connection with the disciplinary hearing, such denial does not rise to a due process violation.

### D.    Right to Respond to Evidence

Plaintiff alleges he was denied the right to hear and to respond to the evidence presented against him at the disciplinary hearing.  Complaint, First Claim for Relief ¶ 2.C.  In support of summary judgment, Defendants characterize the claim as "conclusory," arguing Plaintiff fails to specify any factual basis for the claim. Defendants' Memorandum at 15-16.  In opposition to summary judgment, Plaintiff maintains that Defendant Hearing Officer Ryerson took testimony from C.O. Ley "off the record," without Plaintiff present, and without making an audio recording of such testimony.  Plaintiff's Memorandum at 12-13.  According to Plaintiff, although in certain circumstances a hearing officer is permitted to take a witness's testimony out of the inmate's presence, the failure to record such "off the record" testimony deprives the inmate of the opportunity to hear and respond to such evidence.  *Id*. at 13.  Defendants offer no further reply in support of this claim.

The court's review of the record establishes that Plaintiff called C.O. Ley to testify at the disciplinary hearing, and that Ley appeared and testified.  Disciplinary Hearing T. at Bates No. 32-34.  According to the transcript of the disciplinary hearing, Ley's entire testimony was given in Plaintiff's presence, recorded, and transcribed. *Id*.  Nothing in the record indicates Ley gave any other testimony regarding the charges pending

28

against Plaintiff to anyone, whether or not in Plaintiff's presence or recorded. The record also indicates Plaintiff left the disciplinary hearing before Ryerson delivered the disposition, Disciplinary Hearing T. at 39, and Plaintiff does not argue otherwise. At no time during the disciplinary hearing does Plaintiff raise an objection to the "off the record" taking of testimony from Ley outside Plaintiff's presence. Moreover, the stated reason for Selsky's reversal of Ryerson's guilty disposition does not include any the taking of any testimony from any witness without Plaintiff present. November 22, 2002 Memorandum at Bates No. 62-63.

Plaintiff, as the non-movant, has failed to "produce <u>specific</u> <u>facts</u> indicating that a genuine factual issue exists." *Wright*, 132 F.3d at 137 (underlining added). As such, no reasonable jury could find Plaintiff's evidence meets the requisite burden of proof on this claim. *Amnesty America*, 361 F.3d at 122-23. Defendants' motion should be GRANTED on this claim.

### E.     Recording of Disciplinary Hearing

Insofar as Plaintiff alleges the entire disciplinary hearing was not electronically recorded, including testimony given by C.O. Ley, Complaint, First Claim for Relief, ¶¶ 2.D; Plaintiff's Memorandum at 12-13, although New York law requires that an inmate's disciplinary hearing be recorded, 7 N.Y.C.R.R. § 253.6(b), as discussed above, Discussion, *supra*, at 27, "the *only* process due an inmate is that minimal process guaranteed by the Constitution as outlined in *Wolff*." *Shakur*, at 119 (italics in original). Significantly, *Wolff* did not include electronic recording of a disciplinary hearing among the due process requirements. Moreover, the New York regulation requiring such

recording cannot create any "federally protected due process entitlements to specific state-mandated procedures."  *Holcomb*, 337 F.3d at 224 (2d Cir. 2003).  Accordingly, in the instant case, even if Defendants failed to record a portion of Plaintiff's disciplinary hearing, such failure does not rise to a due process violation.

Defendants' motion should be GRANTED with regard to Plaintiff's First Claim for Relief alleging denial of procedural due process in connection with his disciplinary hearing.


### 4.    CAD Program Claims

Plaintiff makes several claims regarding his temporary removal from the CAD Program, including that such removal violated his First Amendment right to freely exercise his religion, Complaint, Fourth Claim for Relief, ¶¶ 10-13; that the removal was without due process, *id.* ¶¶ 4-7; that the removal was intended by Defendants as retaliation against Plaintiff for filing grievances against certain prison staff members and for providing Defendant Klatt with a statement against Defendant Clark in connection with Klatt's investigation of an unrelated incident involving another Jewish inmate's receipt of his kosher meals, *id.* ¶¶ 1-3, and that such removal was in violation of the Equal Protection Clause, *id.* ¶¶ 1-7, 25.  Although not specifically stated by Plaintiff, his removal from the CAD Program also alleges a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, which the court, in construing the pleadings of a *pro se* litigant, is obligated to address.  *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (instructing that pleadings of *pro se* litigants are held "to less stringent standards that formal pleadings drafter by lawyers . . . .").  *See McEachin*

*v. McGuinnis*, 357 F.3d 197, 199 n. 2 (2d Cir. 2004) (considering RLUIPA claim supported by facts, although not specifically raised, in complaint).

In support of summary judgment, Defendants argue that Plaintiff's removal from the CAD Program was in compliance with Southport's policy permitting the removal of any inmate who gives, sells, or trades kosher food items to another inmate. Defendants' Memorandum at 21-22. According to Defendants, Southport's policy permitting the removal of an inmate found in violation of the CAD Program relates to a legitimate penological interests, specifically, controlling the costs of feeding inmates, and, thus, complies with the reasonableness test to which prison regulations restricting constitutional rights are subjected, *id.* at 17-21, that Plaintiff has failed to establish any basis supporting the assertion that Plaintiff's removal was intended as retaliation against Plaintiff for giving Defendant Klatt a statement against Defendant Clark on July 27, 2004, *id.* at 23-26; that the one-month interruption in Plaintiff's participation in the CAD Program constituted, at most, a *de minimus* injury which would not deter a similarly situated inmate from supporting another inmate by giving a statement against a corrections officer, *id.* at 25-26, and that Plaintiff was not denied due process in being temporarily removed from the CAD Program, *id.* at 26-28. In opposition to summary judgment, Plaintiff asserts that he was removed from the CAD Program without due process, as is evidenced by the fact that after Plaintiff filed ten grievances complaining about his removal from the CAD Program, Plaintiff was reinstated in the program, Plaintiff's Memorandum at 14-16, and that Plaintiff's removal from the CAD Program two days after Plaintiff gave Defendant Klatt a statement against Defendant Clark relative to a misbehavior report issued against another Jewish inmate, establishes Plaintiff's

removal was in retaliation for the statement, *id.* at 16-17, that Plaintiff never received the May 18, 2004 Memorandum advising that giving kosher food to inmates not participating in the CAD Program would result in removal from the program, *id.* at 17-18, and that because Southport is comprised solely of SHU housing, Plaintiff had no other means to obtain kosher food either through packages or purchase as general population inmates can. *Id.* at 18. Finally, Plaintiff challenges Defendants' assertion that the increased cost of providing kosher meals supports Southport's policy regarding termination from the CAD Program as stated in the May 18, 2004 Memorandum because Plaintiff is required to accept all food provided on the kosher tray, including sealed and non-perishable meats which Plaintiff does not eat, resulting in such foods being thrown away, which can result in Plaintiff's removal from the CAD Program based on wasting food. *Id.* at 18-20.

### A.      First Amendment, RLUIPA and Due Process

Defendants argue in support of summary judgment that Plaintiff's removal from the CAD Program did not violate due process because Southport's policy permitting the termination of an inmate who violated the terms of the CAD Program are reasonably related to a legitimate penological interest, *i.e.*, controlling the costs of feeding inmates, and, thus, complies with the reasonableness test to which prison regulations restricting constitutional rights are subjected. Defendants' Memorandum at 17-21. Plaintiff questions Defendants assertion that Southport's CAD Program policy is reasonably related to the legitimate penological interest of controlling correctional facility expenses given that, despite the alleged increased cost of providing kosher meals as compared to

32

the fare provided the general prison population, requires Plaintiff to accept all food items contained on the kosher tray, including sealed packages of meat which Plaintiff does not eat, resulting in the disposal of such food items. Plaintiff's Memorandum at 18-20. Nevertheless, Plaintiff's essential claim, as well as his essential argument in opposition to summary judgment, is that Plaintiff was removed from the CAD Program without due process, specifically, without any advance notice or opportunity to challenge the claimed reasons for his removal. *Id*. Defendants have not addressed this aspect of Plaintiff's claim other than asserting the May 18, 2004 Memorandum advising that any violation of the CAD Program policy was cause for removal. Defendants' Memorandum at 26-28.

It is settled that an inmate may not be deprived of a protected liberty interest without due process of law. *Sandin*, 515 U.S. at 484. "To articulate a claim under 42 U.S.C. § 1983 alleging the violation of a liberty interest without procedural due process, an inmate must first establish he enjoyed a protected liberty interest." *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998) (citing *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989)). "Inmates' protected liberty interests are typically derived from two sources, the Fourteenth Amendment Due Process Clause and state statutes or regulations." *Id*. "With respect to interests arising directly under the Due Process Clause, the Supreme Court has narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners.'" *Arce*, 139 F.3d at 222 (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)).

It is settled that among the "most basic liberty interests" retained by prison inmates is the First Amendment right to freely exercise religion. *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) ("Prisoners have long been understood to retain some

measure of the constitutional protections afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). Further, "[a]t least as early as 1975, it was established that prison officials must provide a prisoner a diet that is consistent with his religious scruples." *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992) (citing *Kahane v. Carlson*, 527 F.2d 492 (2d Cir. 1975)).

Whether asserted under the First Amendment or the RLUIPA, a religious liberty claim requires the prisoner demonstrate "that the disputed conduct substantially burdens his *sincerely held religious beliefs*." *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006 (italics added) (citing RLUIPA, 42 U.S.C. § 2000cc-1(a), and *Ford v. McGinnis*, 352 F.3d 582, 587 (2d Cir. 2003) (First Amendment Free Exercise Clause)).[12] As relevant, § 3 of the RLUIPA provides that the government shall not "impose a substantial burden" on the "religious exercise" of inmates in certain institutions unless the government demonstrates that the burden furthers a compelling governmental interest by the least restrictive means. 42 U.S.C. § 2000cc-1(a); *see Salahuddin*, 467 F.3d at 273. "Religious exercise" is defined under the RLUIPA to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "Section 3 applies if 'the substantial burden [on religious exercise] is imposed in a program or activity that received Federal financial assistance.'" *Salahuddin*, 467 F.3d at 273 n. 2 (quoting 42 U.S.C. § 2000cc-1(b)(1). "In the prison

---

[12] Because the threshold inquiry of a religious freedom claim under both the First Amendment and the RLUIPA is the same, the court does not consider whether a violation of the RLUIPA, which provides for a separate cause of action, can serve as a basis for a § 1983 claim. *See Salahuddin*, 467 F.3d at 273-75 (addressing inmate plaintiff's § 1983 religious liberty claim asserted under both First Amendment Free Exercise Clause and RLUIPA § 3, without discussing whether RLUIPA provides a basis for § 1983 action).

context, this section sweeps broadly as '[e]very State . . . accepts federal funding for its prisons.'" *Id.* (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 716 n. 4 (2005)).

Analyzing Plaintiff's claim under the First Amendment, "[t]he Free Exercise Clause of the First Amendment is an 'unflinching pledge to allow our citizenry to explore . . . religious beliefs in accordance with the dictates of their conscience.'" *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)). Because prisoners retain their right to religious freedom even when incarcerated, inmates are entitled to reasonable accommodation of their religious beliefs, consistent with needs of prisoner security, including "religious dietary beliefs, as 'prison officials must provide a prisoner a diet that is consistent with his religious scruples.'" *Jackson*, 196 F.3d at 320 (citing cases and quoting *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992)). The court, however, is precluded on summary judgment from weighing facts so as to determine the sincerity of Plaintiff's religious beliefs. *Jackson*, 196 F.3d at 320.

As discussed in connection with Plaintiff's disciplinary hearing due process claim, an inmate charged with a prison violation must be given "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent, Mass. Corr. Inst., Walpole*, 472 U.S. at 454. Discussion, *supra*, at 19. In the instant case, Defendants do not deny that Plaintiff was not given advance notice of any claim prior to terminating Plaintiff from the CAD Program. Although it is undisputed that Plaintiff filed prison grievances regarding the

termination and was, on September 1, 2004, reinstated to the CAD Program, it is not clear from the record whether Plaintiff was provided any other due process in connection with such grievances.

The termination of Plaintiff without any advance notice or opportunity to rebut the alleged CAD Program violation is in stark contrast to the prison regulation providing for an inmate to be immediately placed in the CAD Program upon self-declaring belief in the Jewish faith. As stated, no reason is provided for Plaintiff's reinstatement to the CAD Program. Further, the statements in Held's Memorandum, which provided the basis for Irizarry's decision to terminate Plaintiff from the CAD Program, do not necessarily attribute the CAD Program violation, *i.e.*, providing another inmate with food items from Plaintiff's kosher tray, to Plaintiff. Rather, Held specifically reported that he "observed the C-T company porter take ½ of a kosher tray from C-7-8 Ramsey [ ] with food items" and give the food items to Anderson, another inmate, and that "Ramsey is the only kosher meal on C-7 company at this time." Held's Memorandum. Irizarry's Memorandum makes clear that it was presumed that Plaintiff cooperated with, or voluntarily allowed, the inmate porter to give part of Plaintiff's kosher food tray to Anderson. Irizarry's Memorandum ("You [Ramsey] are the only one who is receiving the cold alternative meal on this gallery, so it is obvious that you are the one giving or trading your food."). From these disputed facts, a reasonable jury could conclude that it was the inmate porter, who also had control of Plaintiff's kosher food tray, rather than Plaintiff, who was trading the kosher food items with Anderson, in violation of Southport's policy.

Further, although Defendants argue that the temporary removal of Plaintiff from

the CAD Program from July 29 to September 1, 2004 constituted no more than a *"de minimus"* interference with Plaintiff's free exercise of his religion, Defendants' Memorandum at 25, Defendants cite no caselaw in support of this argument, and the court's research reveals none. The court observes that depriving an inmate of even one religious meal can rise to a First Amendment free exercise violation provided the inmate considered participation in the meal, a Muslim holiday feast, central to such inmate's practice of his religion. *Ford*, 352 F.3d at 593-94 (holding that despite Muslim cleric's testimony that participation in the subject Muslim holiday feast is not religiously required, the relevant inquiry was whether inmate plaintiff considered participation in such feast central or important to inmate's practice of Islam). Whether keeping kosher is a central tenet of Plaintiff's sincerely held religious beliefs is an issue of fact precluding summary judgment. *See* Plaintiff's Affidavit ¶ 51 (averring that as a result of Irizarry's Memorandum advising Plaintiff had been removed from the CAD Program, Plaintiff was "no longer allowed to follow my religion's dietary laws."). The record is silent as to what Plaintiff ate while temporarily removed from the CAD Program.

Construing the evidence, including Plaintiff's averments, in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, as required on summary judgment, *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005), the court cannot say that no reasonable jury could not find that Plaintiff did not consider keeping kosher a central tenet of his religious beliefs. *See Ford*, 352 F.3d at 593-94. *Compare Odom v. Dixion*, 2008 WL 466255, *10-11 (W.D.N.Y. Feb. 15, 2008) (granting summary judgment against plaintiff inmate who, in attempting to establish sincerity of plaintiff's interpretation of Jewish dietary law as requiring plaintiff to eat in

kosher mess hall and that only people of Jewish faith were permitted to prepare CAD Program meals, relied on an article that failed to support such interpretation). Accordingly, the court is unable to say that missing more than 30 days of kosher meals constituted no more than a *de minimus* injury to Plaintiff.

Summary judgment on Plaintiff's First Amendment and RLUIPA claims based on denial of due process should be DENIED.


**B.    Equal Protection**

Plaintiff alleges that his removal from the CAD Program for providing a statement to Defendant Klatt against Defendant Clark regarding another Jewish inmate violated his right to equal protection of the law.  Complaint, Fourth Claim for Relief ¶ 25. Defendants argue Plaintiff is unable to show the requisite "'purposeful discrimination directed at an identifiable suspect or class'" to establish this claim.  Defendants' Memorandum at 22-23 (quoting *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995)).  Plaintiff has not argued in further support of this claim.

"The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated in the same manner."  *Allen v. Cuomo*, 100 F.3d 253, 260 (2d Cir. 1996) (citing *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985)).  Inmates are not, however, similarly situated to unincarcerated persons; rather, "[t]he rights of prisoners are necessarily limited because of their incarceration," and "[a] state may treat differently situated people in a different way."  *Allen*, 100 F.3d at 260 (citing cases).  Establishment of an equal protection violation requires the plaintiff show "purposeful discrimination directed at an identifiable suspect class."  *Giano v.*

*Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citing cases). Although discrimination based on religion can establish an equal protection violation, *Benjamin v. Coughlin*, 905 F.2d 571, 574-75 (2d Cir. 1990), inmates do not constitute a suspect class, *Allen*, 100 F.3d at 260 n. 1, and, thus, no higher level of scrutiny is required. *Turner v. Safley*, 482 U.S. 78, 81 (1987) (holding lower level of scrutiny is applied to equal protection challenges to prison rules and regulations). To establish an equal protection claim based on religion, Plaintiff must present evidence that "he was treated differently from similarly situated members of other religions." *Jackson*, 196 F.3d at 321 (citing *Giano*, 54 F.3d at 1057).

Here, in support of summary judgment, Defendants explain that because Plaintiff's equal protection claim is based on Plaintiff's removal from the CAD Program for violating the CAD Program's prohibition against inmates exchanging food items with other inmates, the identifiable class is not the general prison population but, rather, CAD Program inmates. Defendants' Memorandum at 23. As such, according to Defendants, to show purposeful discrimination in violation of the Equal Protection Clause, Plaintiff must demonstrate that Plaintiff has been treated differently than other inmates in the CAD Program. *Id*. Defendants further maintain that even if the correct comparison for establishing an equal protection violation is between inmates in the CAD Program and inmates receiving the standard prison fare, a rational relationship between prohibiting CAD Program inmates from exchanging CAD diet foods and the costs of such diet precludes any finding of liability based on an equal protection violation. *Id*. Defendants' argument, however, misses the point.

In particular, Plaintiff does not claim that Southport's policy permitting his removal

from the CAD Program violated his right to equal protection but, rather, Plaintiff claims

that he was removed from the CAD Program after Plaintiff, who is Jewish, provided a

statement to Defendant Klatt against Defendant Clark regarding prison disciplinary

charges placed against anther Jewish inmate.  *See* Complaint, Fourth Claim for Relief,

¶¶ 1-6.  In other words, Plaintiff claims that Defendants discriminated against Plaintiff

based on Plaintiff's Jewish faith, by removing Plaintiff from the CAD Program when

Plaintiff attempted to assist another Jewish inmate with regard to a prison disciplinary

charge.[13]  Plaintiff, however, fails to present any evidence that Defendants did not

subject inmates of other faiths, or of no faith whatsoever, to similar treatment.  *See*

*Jackson*, 196 F.3d at 321 (holding district court properly granted summary judgment on

inmate plaintiff's claim that defendant prison officials denied plaintiff equal protection by

requiring plaintiff to prove he was Jewish according to Judaic law because plaintiff

presented no evidence that he was treated differently from similarly situated members

of other religions).

On this record, summary judgment on Plaintiff's equal protection claim should

therefore be GRANTED.


**C.     Retaliation**

Plaintiff alleges that on July 29, 2004, Defendants, to retaliate against Plaintiff for

---

[13] Insofar as Plaintiff's equal protection claim alleges Defendants retaliated against Plaintiff for assisting another Jewish inmate in defending against an alleged prison violation, such claim "is more properly anchored in the Free Exercise Clause than the Establishment Clause," *Jackson*, 196 F.3d at 321, as discussed below.  Discussion, *infra*, at 40-43.

providing Defendant Klatt with a statement against Defendant Clark to assist another Jewish inmate in defending against disciplinary charges, removed Plaintiff from the CAD Program. Complaint, Fourth Claim for Relief. Defendants argue in support of summary judgment that Plaintiff is unable to establish the requisite causal connection between Plaintiff's participation in a protected activity, *i.e.*, providing Klatt with a statement against Clark, and Defendants' removal of Plaintiff from the CAD Program. Defendants' Memorandum at 23-26. In opposition to summary judgment, Plaintiff asserts that the short period of time – 20 minutes – between providing Klatt with a statement against Clark and his removal from the CAD Program establishes a causal connection between the two events. Plaintiff's Memorandum at 20-22.

For a plaintiff to succeed in a First Amendment retaliation claim, he must show that 1) the conduct cited as the cause for retaliation is protected; 2) the defendant took adverse action against the plaintiff; and 3) there was a causal connection between the protected conduct and the adverse action. *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003). Courts are properly skeptical of prisoner retaliation claims as "virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis*, 320 F.3d at 353 (internal quotation marks and citation omitted). In making this determination, courts are to "bear in mind" that "prisoners may be required

to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Dawes*, 239 F.3d at 493 (internal quotation marks and citations omitted).

The plaintiff "bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' [actions]." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). Upon satisfying this burden, the burden shifts to defendants to establish that the same adverse action would have been taken even in the absence of the plaintiff's protected conduct, *i.e.*, "even if they had not been improperly motivated." *Graham*, 89 F.3d at 80. "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." *Davidson v. Chestnut*, 193 F.3d 144, 148-49 (2d Cir. 1999). In the instant case, the record establishes a genuine issue of material fact supporting Plaintiff's retaliation claims.

First, it is settled that Plaintiff's engaged in protected activity when he provided Klatt with a statement against Clark. *Haymes v. Montanye*, 547 F.2d 188, 191 (2d Cir. 1976) (holding plaintiff inmate had standing to raise First Amendment challenge to transfer to another prisoner allegedly to retaliate against plaintiff for providing legal assistance to other inmates), *cert. denied*, 431 U.S. 967 (1977). *See also Davis*, 320 F.3d at 352-53 (participation in prison grievances is "constitutionally protected activity"). In particular, according to Plaintiff, on July 29, 2004, Klatt took Plaintiff's written statement and gave it to Defendant Held. Plaintiff's Affidavit ¶ 47. It is also undisputed that Defendants' removal of Plaintiff from the CAD Program was an adverse action, in

satisfaction of the second element of a retaliation claim.  *See Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999) (observing that denial of kosher diet is an adverse action that may support retaliation claim).

Further, the close proximity between Plaintiff's provision to Klatt of a statement adverse to Clark, and Plaintiff's removal from the CAD Program is sufficient to establish a causal connection for the purpose of avoiding summary judgment. *Colon*, 58 F.3d at 872  (holding the temporal proximity of an adverse action in relation to the filing of an inmate grievance is circumstantial evidence of a causal connection so as to establish a retaliation claim).  Here, Plaintiff specifically alleges that on July 29, 2004, 20 minutes after Plaintiff provided Klatt with the statement, Held announced over the correctional facility's public address system: "8-cell Ramsey, the problems regarding the missing items on the kosher trays have been resolved.  You are no longer on the kosher meal program."  Plaintiff's Affidavit ¶ 48.  A short while after Held allegedly made the announcement, the noon meal was served, but Plaintiff was not fed.  Plaintiff's Affidavit ¶ 50.  Held then prepared a memorandum advising Irizarry that Held observed an inmate porter take the top half of Plaintiff's kosher food tray and give the kosher food items to another inmate, Anderson, who was not in the CAD Program.  Held Declaration ¶ 5; Held's Memorandum.  On July 29, 2004, Irizarry provided Plaintiff with Irizarry's Memorandum advising Plaintiff that because Plaintiff was the only inmate on that gallery, it was "obvious" that Plaintiff was either giving or trading kosher food in violation of the CAD Program and, based on such violation, Plaintiff was being removed from the CAD Program.  Irizarry Declaration ¶ 7; Irizarry's Memorandum.

Although Defendants allege that Plaintiff was removed from the CAD Program

because Held observed Plaintiff violating the terms of the CAD Program by giving away items from his kosher food tray to another, non-Jewish inmate, Plaintiff has alleged additional facts which, if true, would establish a genuine issue of fact as to whether Plaintiff's removal from the CAD Program would have occurred absent Plaintiff's participation in the inmate grievance process. In particular, Plaintiff's allegation that because he does not eat meat, which was served with the CAD Program six out of seven days, he was always returning the meat from his kosher tray, the fact that it was an inmate porter, rather than Plaintiff who was observed taking the kosher food items from Plaintiff's tray and giving them to another inmate, and the fact that the record is devoid of any explanation as to why Plaintiff was reinstated to the CAD Program, all suggest that the removal of Plaintiff from the CAD Program, although temporary, was done to retaliate against Plaintiff's participation in the inmate disciplinary process regarding the other Jewish inmate being charged by Clark. *See Graham*, 89 F.3d at 80 (material issue of fact as to whether prison officials punished inmates in retaliation for protesting proposed removal of showers from prison workshop precluded summary judgment for defendant prison officials who claimed inmate's punishment was based on inmate's alleged role in organizing work slowdown). As such, summary judgment on Plaintiff's retaliation claim should be DENIED.

5.      **First Amendment Access to Courts**

Plaintiff claims that Defendants Ames and Litwiler violated Plaintiff's First Amendment rights of access to courts and to petition for grievances by confiscating writing paper and carbon paper on February 25, 2004. Complaint, Fifth Claim for Relief

¶ 1. Plaintiff also claims he was denied writing materials from Southport's law library between February 23 and March 8, 2004, *id.* ¶ 2, and between June 7 and 14, 2004, *id.* ¶ 10. According to Plaintiff, the denial of access to such materials prejudiced Plaintiff's ability to prepare or perfect various inmate grievances and civil rights litigation. *Id.* ¶¶ 3,10. Plaintiff specifically alleges that he was denied the use of a stapler to properly bind papers to be filed with the Second Circuit Court of Appeals, resulting in Plaintiff's papers being rejected. *Id.* ¶¶ 10-11.

Defendants, in support of summary judgment, argue that Plaintiff cannot establish that either Ames or Litwiler was personally involved in the alleged interference with Plaintiff's right of access to courts, and that upon Plaintiff's arrival at Southport, in accordance with DOCS Directive No. 4933, § 302.1, regarding the admission of inmates to SHU, Plaintiff's writing paper and carbon paper would have been subject to confiscation because such items are not considered part of an inmate's personal property. Defendants' Memorandum at 35-36; Litwiler Declaration ¶ 5. In opposition to summary judgment, Plaintiff challenges Defendants' assertion that Plaintiff's writing and carbon paper were confiscated in accordance with DOCS Directive No. 4933[14] because upon being admitted to Southport, inmates are permitted to have as much writing and carbon paper as needed for litigation. Plaintiff's Memorandum at 22-24. In further support of summary judgment, Defendants maintain that under relevant DOCS regulations, writing and carbon paper are not considered "legal materials" and that, upon being assigned to a cell, an SHU inmate had only to request writing materials to

_____

[14] A copy of the relevant portion of DOCS Directive No. 4933 is attached as Exh. A to the Litwiler Declaration.

receive them.  Murphy Reply Declaration ¶ 18.

It is settled that "meaningful access to the courts is the touchstone" of the First Amendment as it pertains to litigation commenced by a prison inmate.  *Bounds v. Smith*, 430 U.S. 817, 823 (1977); *Monsky v. Moraghan*, 127 F.3d 243, 246 (2d Cir. 1997). Specifically, "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at 828.  In accordance with the right of access to the courts as espoused by *Bounds*, "[i]t is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them." *Id*. at 824-25.  Where an inmate alleges inadequate law libraries, or other sources of legal knowledge, or a prison official's interference with the physical filing of legal papers, no actual injury need be alleged. *Id*. at 829.  Where, however, as here, it is alleged that access to materials needed for court matters has been denied, a plaintiff must alleged that the denial proximately caused some "actual injury," *i.e.*, some prejudice of denial of a legal claim. *Lewis v. Casey*, 518 U.S. 343, 351 (1996).

As relevant to this case, an "actual injury" requires a showing that it was the actions of Defendants that caused some litigation of Plaintiff's to be dismissed.  *See Smith v. O'Connor*, 901 F.Supp. 644, 649 (S.D.N.Y. 1995) ("To state a claim that his constitutional right to access the court was violated, plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to

pursue."). No cause of action for interfering with an inmate's First Amendment right of access to the court lies, however, until and unless the inmate demonstrates that he suffered actual harm, *i.e.*, that a "nonfrivolous legal claim had been frustrated or impeded." *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (italics added).

In this case, however, Plaintiff only alleges actual injury when his papers filed with the Second Circuit Court of Appeals were rejected as improperly bound, which Plaintiff attributes to an unnamed Southport employee's denial of use of a stapler between June 7 and 14, 2004. Complaint, Fifth Claim for Relief, ¶¶ 10-11. Significantly, Defendants Ames and Litwiler are not alleged to have been personally involved in denying Plaintiff use of a stapler to properly bind such papers. Defendants maintain that Litwiler and Ames were, at all relevant times, assigned to the draft area of Southport where each incoming inmate is received and "locked . . . only for a matter of hours until he is assigned to a specific cell." Litwiler Declaration ¶ 3. Litwiler maintains, and Plaintiff does not dispute, that Litwiler was working in the position of "draft sergeant,"[15] with Ames working under Litwiler's supervision in the draft area, assisting with the processing of incoming inmates. *Id*. As such, neither Ames nor Litwiler was involved in any decision regarding Plaintiff's use of a stapler to bind documents Plaintiff filed with the Second Circuit between June 7 and 14, 2004. Defendants' Memorandum at 35-36.

Furthermore, insofar as Ames and Litwiler do not deny that, in accordance with

---

[15] Although the record does not specifically specify the duties of a "draft sergeant," the context in which the term is used suggests a "draft sergeant" is responsible for screening inmates prior to making specific cell assignments.

DOCS Directive No. 4933, Plaintiff's writing paper and carbon paper would have been confiscated when Plaintiff initially arrived at Southport because such paper does not qualify as an inmate's personal property, Plaintiff does not allege that as a result of Ames and Litwiler's confiscation of his writing paper and carbon paper he suffered any actual injury to any litigation or inmate grievance. Rather, Plaintiff's sole argument in opposing summary judgment on this issue is that interpreting DOCS Directive No. 4933 as permitting the confiscation of writing paper and carbon paper because such items do not constitute personal property is inconsistent with DOCS' policy of allowing inmates to have unlimited paper after being assigned to a cell. Plaintiff's Memorandum at 22-24. Plaintiff, however, fails to allege he suffered any actual injury resulting from the confiscation of his writing paper and carbon paper upon being admitted to Southport.

Therefore, summary judgment should be GRANTED in favor of Defendants on this claim.

### 6. Qualified Immunity

Alternatively, Defendants argue they are entitled to qualified immunity with regard to Plaintiff's claims. Defendants' Memorandum at 37-38. Plaintiff has not responded to this argument.

Qualified immunity shields law enforcement officials who perform discretionary functions from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable prison official would have known. *Pearson v. Callahan*, __ U.S. __, 129 S.Ct. 808, 815 (2009) (citing Harlow *v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Washington Square Post No. 1212 v. Maduro*, 907 F.2d 1288, 1291

(2d Cir. 1990). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 129 S.Ct. at 815 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson*, 129 S.Ct. at 815 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). It is important to resolve immunity questions at the earliest possible stage of litigation to preserve the purpose of qualified immunity, *i.e.*, ensuring that insubstantial claims against government officials are resolved prior to discovery. *Id.* (citing cases). *See Saucier v. Katz*, 533 U.S.194, 200 (2001) ("Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." (internal quotation omitted)).

Resolution of a government official's qualified immunity claim involves a two-prong analysis, including (1) whether the plaintiff has alleged a deprivation of a constitutional right; and (2) whether such right was clearly established at the time of the defendant's alleged misconduct. *Pearson*, 129 S.Ct. at 815-16; *Saucier*, 533 U.S. at 201. Although both prongs must be established, it is within the court's discretion which prong should be addressed first in light of the circumstances of the case at hand. *Pearson*, 129 S.Ct. at 818. In the instant case, Defendants are not entitled to qualified immunity on some of Plaintiff's claims.

At the time of the July 14, 2002 Elmira disciplinary hearing, it was clearly established that Plaintiff was entitled to "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional

49

goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent, Mass. Corr. Inst., Walpole*, 472 U.S. at 454. As such, Defendants would not be entitled to qualified immunity with regard to Plaintiff's claims that he was denied the opportunity to call witnesses and to hear and respond to the evidence presented against him at the disputed hearing, Complaint, First Claim for Relief ¶ 2.A and C, but not with regard to Plaintiff's claims that he was denied employee assistance and that the entire disciplinary hearing was not electronically recorded, Complaint, First Claim for Relief ¶ 2.B and D.

When Plaintiff's temporary removal from the CAD Program commenced on July 29, 2004, it was clearly established that Plaintiff was entitled to a diet consistent with his religious beliefs, *Bass*, 976 F.2d at 99, and that such beliefs were protected under the First Amendment Free Exercise Clause. *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999). Nevertheless, as the Second Circuit did not consider whether the RLUIPA provided protection to an inmate's right to a diet consistent with religious beliefs until December 6, 2004, more than four months after Plaintiff was temporarily removed from the CAD Program, Defendants would be entitled to qualified immunity on the RLUIPA claim. *See Shakur v. Selsky*, 391 F.2d 106, 120 (2d Cir. 2004) (holding inmate stated claim under RLUIPA by alleging defendant corrections officers refused to allow inmate to attend Muslin holiday feast of Eid-ul-Fitr, "one of two major religious observances in Islam."). Furthermore, that Plaintiff was entitled to provide Defendant Klatt with a statement against Defendant Clark regarding a misbehavior report filed against another Jewish inmate without fear of retaliation was also established as of Plaintiff's removal

from the CAD Program. *See, e.g.*, *Haymes*, 547 F.2d at 191 (holding plaintiff inmate had standing to raise First Amendment challenge to transfer to another prisoner allegedly to retaliate against plaintiff for providing legal assistance to other inmates). *See also Davis v. Goord*, 320 F.3d 346, 352-54 (2d Cir. 2003) (holding inmate's claim that prison officials denied plaintiff his high fiber diet days after filing inmate grievances sufficiently alleged First Amendment retaliation claim).

Finally, with regard to Plaintiff's claim that the confiscation of his stationery materials upon being transferred to Southport deprived him of meaningful access to the courts, such First Amendment right was clearly established by 1977. *Bounds*, 430 U.S. 823.

In short, on this record, if the facts as alleged by Plaintiff are established at trial, no reasonable corrections officer could reasonably believe he was not violating Plaintiff's Fourteenth Amendment rights to due process with regard to Plaintiff's claims that he was denied the right to call witnesses and hear and examine the evidence at his disciplinary hearing, as well as under the First Amendment's Free Exercise Clause to a diet consistent with his religious beliefs, to petition the government for redress of grievances free from retaliation, and the First Amendment provision for meaningful access to the courts. *Saucier*, 533 U.S. at 201. As such, Defendants' summary judgment motion, insofar as it alternatively asserts the defense of qualified immunity, should be DENIED with regard to these claims, but should be GRANTED insofar as Plaintiff claims Defendants denied him due process under the Fourteenth Amendment by failing to provide Plaintiff with an employee assistant in preparing for the disciplinary hearing, failing to record the entire hearing, and denying Plaintiff kosher meals in

violation of the RLUIPA.

## **CONCLUSION**

Based on the foregoing, Defendants' motion for summary judgment (Doc. No. 22) should be GRANTED in part and DENIED in part.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:  August 19, 2009
     Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     August 19, 2009
           Buffalo, New York